UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA

| | | |
|---|---|---|
| A.T., an individual, | ) | Case No.: |
| Plaintiff, | ) | |
| vs. | ) | COMPLAINT |
| WYNDHAM HOTELS & RESORTS, INC. and | ) | |
| CHOICE HOTELS INTERNATIONAL, INC., | ) | |
| Defendant(s) | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

## COMPLAINT

COMES NOW the Plaintiff A.T., by and through the undersigned counsel, and respectfully submits her complaint for damages and makes the following averments.

## INTRODUCTION

1.   For years, sex trafficking ventures have brazenly operated in and out of hotels throughout this country. Criminals parade their misconduct openly on hotel properties throughout the United States while the hotels and hospitality industry continues to neglect the criminal misconduct to continue earning a profit at the expense of human life, human rights, and human dignity.

2.   Defendants Wyndham Hotels & Resorts, Inc. (hereinafter "Wyndham") and Choice Hotels International, Inc. (hereinafter "Choice" or "Choice Hotels"),[1] know and have known for more than a decade that sex trafficking repeatedly occurs under their flag throughout the country. Rather than taking timely and effective measures to thwart this epidemic, Defendant Hotels have instead chosen to ignore the open and obvious presence of sex trafficking on their properties, enjoying the profit from rooms rented for this explicit and apparent purpose.

3.   This action for damages is brought by the Plaintiff, a survivor of sex trafficking hereinafter identified by her initials A.T., under the federal William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (hereinafter "TVPRA").

4.   A.T. was trafficked for commercial sex as a minor in Washington. A.T. was sold via commercial sex transactions at the Defendants' hotel properties through force, fraud, and coercion as the Defendants did nothing but profit.

5.   The Plaintiff now brings this action for damages against the Defendants listed herein. Each of the Defendants, in violation of 18 U.S.C. § 1595, knowingly benefited from facilitating a venture that they knew, or at the very least should have known, to be engaging in sex trafficking in violation of 18 U.S.C. § 1591(a).

6.   A.T. was advertised on www.backpage.com and sexually exploited at hotels in Washington, including the Super 8, Days Inn, and Clarion Inn.

---

[1] Collectively, Wyndham and Choice may be referred to as "Defendant Hotels."

7.   As a direct and proximate result of Wyndham and Choice's consistent refusals to prevent human trafficking on their hotel properties, A.T. was sex trafficked, sexually exploited, and victimized repeatedly at Wyndham and Choice brand hotels.

8.   The Plaintiff brings this action pursuant to the Trafficking Victims Protection Reauthorization Act 18 U.S.C. §1595, against the Defendants who enabled, harbored, held, facilitated, or otherwise financially benefited, or any combination of the foregoing, from a sex trafficking venture in which A.T. was trafficked for sex, sexually exploited, and victimized in violation of the TVPRA.

**PARTIES**

9.   Plaintiff A.T. is a natural person who resides in Pierce County, Washington.

    a.   Plaintiff A.T. was a minor when she was first sold throughout Washington for the purposes of commercial sex. The Plaintiff is a victim of trafficking pursuant to 22 U.S.C. §7102 (15) and 18 U.S.C. §1591 (a), and a victim of a "severe form of trafficking" as it is defined under 22 U.S.C §7102 (14).

    b.   Due to the sensitive, private, and potentially retaliatory nature of the allegations, Plaintiff A.T. requests that this Court grant a protective order pursuant to Federal Rule of Civil Procedure 26(c) to permit her to proceed under a pseudonym to ensure Defendants keep Plaintiff's identity confidential throughout the pendency of the lawsuit thereafter. [2]

    c.   Generally, under the Federal Rules of Civil Procedure, pleadings must state the name of all parties.[3] However, there are exceptions when the issues involved are of a sensitive and highly personal nature.[4] For good cause, the Court may issue an order

---

[2] In cases where the plaintiffs have demonstrated a need for anonymity, the district court should use its powers to manage pretrial proceedings under Fed. R. Civ. P. 16(b), and to issue protective orders limiting disclosure. of the party's name under Fed. R. Civ. P. 26(c), to preserve the party's anonymity to the greatest extent possible without prejudicing the opposing party's ability to litigate the case. *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1069 (9th Cir. 2000).
[3] Fed. R. Civ. P. 10(a).
[4] A district court must balance the need for anonymity against the general presumption that the parties' identities are public information and the risk of unfairness to the opposing party. *See e.g., M.M. v. Zavaras*, 139 F.3d 798, 803 (10th Cir.1998); *James v. Jacobson*, 6 F.3d at 238 (4th Cir.); *Doe v. Frank*, 951 F.2d 320, 323–24 (11th Cir.1992); *Doe v. Stegall*, 653 F.2d at 186 (5th Cir.); *see also Doe v. Frank* at 323 (11th Cir. 1992) (holding that a plaintiff should be permitted to proceed anonymously in cases involving matters of a highly sensitive and personal nature, real danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity).

to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense.[5]

d.  Here, granting pseudonym status and proceeding under seal is warranted because this litigation will involve the disclosure of stigmatizing sexual information, including rape. Plaintiff fears the stigma from her family, friends, employer, and community if her true identity was revealed in the public record.

e.  Plaintiff should not be compelled to disclose her identity in order to maintain her privacy and safety. Plaintiff's privacy interest substantially outweighs the customary practice of judicial openness.[6]

f.  Moreover, Defendants will not be prejudiced. Plaintiff will agree to reveal her identity to Defendants for the limited purpose of investigating Plaintiff's claims once the parties have entered into a protective order. Plaintiff simply seeks redaction of Plaintiff's personal identifying information from the public docket and assurances that Defendants will not use or publish Plaintiff's identity in a manner that will compromise her personal life or future employment prospects.

10.  Defendant Wyndham Hotels and Resorts, Inc. ("Wyndham") is one of the largest hotel brands in the world with nearly 9,000 branded properties in more than eighty (80) countries. It is a Delaware corporation and can be served by its registered agent, Corporate Creations Network, Inc., at 3411 Silverside Road, Tatnall Building Suite 104, Wilmington, Delaware 19810.

a.  Defendant Wyndham Hotels and Resorts, Inc. is the successor entity to Wyndham Worldwide Corporation. Defendant Wyndham Hotels and Resorts, Inc. retains successor liability for wrongful acts of its predecessor Wyndham Worldwide Corporation.

b.  Super 8® by Wyndham ("Super 8®") is a Wyndham Hotels and Resorts, Inc. brand property.

---

[5]    Fed. R. Civ. P. 26(c).
[6]    *Supra* n. 2 at 1068 (the court joined its 4th, 5th, 10th, and 11th sister circuits in holding that a party may preserve his or her anonymity in judicial proceedings in special circumstances when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity).

i.  Defendant Wyndham and the Super 8® by Wyndham are a single and joint employer with a high degree of interrelated, intermingled, and unified operations at the Super 8® by Wyndham Defendant hotel where the Plaintiff was trafficked for sex. Defendant Wyndham and the Super 8® by Wyndham each share the common policies and practices complained of herein.

ii. Defendant Wyndham and the Super 8® jointly employ or ratify the employment of individuals through horizontal joint employment and/or vertical joint employment.

iii. As an integrated enterprise and/or joint employer, Defendant Wyndham and the Super 8® are separately and jointly responsible for compliance with all applicable laws.

iv. As an integrated enterprise and/or joint employer, Defendant Wyndham and the Super 8® are jointly and severally liable for any damages caused by their employees.

v.  As a hotel operator, Defendant Wyndham controls the training on human trafficking or other related policies, including decisions on implementation and execution of policy for its branded properties, including the Super 8® hotel where A.T. was trafficked.

vi. Through its relationship with the staff at the Super 8® where A.T. was trafficked and the perpetrator who trafficked A.T. at Super 8® hotels, Defendant Wyndham knowingly benefited or received something of value from its facilitation of, or participation in, a venture which it knew or should have known had engaged in sex trafficking.

vii. Wyndham benefits financially from room rentals and other incidentals recognized by renting rooms in which the Plaintiff was sex trafficked.

viii.    Wyndham owned, supervised, and/or operated the Super 8® located at 626 N Columbia Center Boulevard, Kennewick, Washington 99336 ("Super 8 Kennewick").

c. Days Inn by Wyndham ("Days Inn") is a Wyndham Hotels and Resorts, Inc. brand property.

    i. Defendant Wyndham and the Days Inn® by Wyndham are a single and joint employer with a high degree of interrelated, intermingled, and unified operations at the Days Inn® by Wyndham Defendant hotel where the Plaintiff was trafficked for sex. Defendant Wyndham and the Days Inn® by Wyndham each share the common policies and practices complained of herein.

    ii. Defendant Wyndham and the Days Inn® jointly employ or ratify the employment of individuals through horizontal joint employment and/or vertical joint employment.

    iii. As an integrated enterprise and/or joint employer, Defendant Wyndham and the Days Inn® are separately and jointly responsible for compliance with all applicable laws.

    iv. As an integrated enterprise and/or joint employer, Defendant Wyndham and the Days Inn® are jointly and severally liable for any damages caused by their employees.

    v. As a hotel operator, Defendant Wyndham controls the training on human trafficking or other related policies, including decisions on implementation and execution of policy for its branded properties, including the Days Inn® hotel where A.T. was trafficked.

    vi. Through its relationship with the staff at the Days Inn® where A.T. was trafficked and the perpetrator who trafficked A.T. at Days Inn® hotels, Defendant Wyndham knowingly benefited or received something of value from its facilitation of, or participation in, a venture which it knew or should have known had engaged in sex trafficking.

    vii. Wyndham benefits financially from room rentals and other incidentals recognized by renting rooms in which the Plaintiff was sex trafficked.

    viii.    Wyndham owned, supervised, and/or operated the Days Inn® located at

2811 West 2nd Avenue Kennewick, Washington 99336 ("Days Inn Kennewick")

11.  Defendant Choice Hotels International, Inc. ("Choice Hotels") is one of the largest hotel brands in the world. It is a Delaware corporation and can be served by its registered agent Corporation Service Company, 251 Little Falls Drive Wilmington, Delaware 19808.

    a.  Clarion Inn® is a Choice Hotels brand property.

    b.  Defendant Choice and the Clarion Inn® are a single and joint employer with a high degree of interrelated, intermingled, and unified operations at the Clarion Inn® hotel where the Plaintiff was trafficked for sex. Defendant Choice and the Clarion Inn® each share the common policies and practices complained of herein.

    c.  Defendant Choice and the Clarion Inn® jointly employ or ratify the employment of individuals through horizontal joint employment and/or vertical joint employment.

    d.  As an integrated enterprise and/or joint employer, Defendant Choice and the Clarion Inn® are separately and jointly responsible for compliance with all applicable laws.

    e.  As an integrated enterprise and/or joint employer, Defendant Choice and the Clarion Inn® are jointly and severally liable for any damages caused by employees.

    f.  As a hotel operator, Defendant Choice Hotels controls the training and human trafficking or other related policies, including decisions on implementation and execution of policy for its branded properties including the Clarion Inn® hotel where Plaintiff was trafficked.

    g.  Defendant Choice Hotels maintains that it considers guest safety and security to be important and requires the hotels in its portfolio to comply with Choice brand standards and all local, state, and federal laws.

    h.  Through its relationship with the staff at the Clarion Inn® hotel where Plaintiff was trafficked and the perpetrator who trafficked Plaintiff at the Clarion Inn®, Defendant Choice Hotels knowingly benefited or received something of value from its facilitation of or participation in a venture which it knew or should have known had engaged in sex trafficking.

    i.  Choice Hotels benefits financially from room rentals and other incidentals recognized

by renting rooms in which the Plaintiff was sex trafficked.

> j.   Choice Hotels owns, supervises, and/or operates the Clarion Inn® located at 1507 North 1st Street, Yakima, Washington 98901 ("Clarion Yakima").

12.   Whenever reference is made in this Complaint to any act, deed, or conduct of the Defendants, the allegation is that the Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of the Defendants.

## JURISDICTION AND VENUE

13.   This Honorable Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 because this action arises under the Constitution, laws, or treaties of the United States (with an amount in controversy that exceeds $75,000).

14.   Venue is proper in this district pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims asserted in this action, including the Defendants' misconduct and omissions, occurred in the judicial district where this action is brought.

## SEX TRAFFICKING UNDER FEDERAL LAW

15.   The requirements for liability under TVPRA § 1595 on a beneficiary theory can be stated as follows: (1) the person or entity must "knowingly benefit[], financially or by receiving anything of value," (2) from participating in a venture, (3) that the "person knew or should have known has engaged in an act in violation of this chapter." 18 U.S.C. § 1595(a).

16.   Sex trafficking is defined by the TVPRA under 22 U.S.C. § 7102, as "the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of a commercial sex act and in which the commercial sex act is induced by force, fraud, or coercion."  This definition combines the three elements of sex trafficking as a criminal offense: the act, the means, and the purpose.

17.   To best understand the mechanism by which sex trafficking ventures are prohibited by federal criminal law, it's best to address these elements in the reverse. Sex trafficking is slavery for

the *purpose* of commercial sex, a lens on the already existing crimes prohibited by 18 U.S.C. § 1589 and §1590. The crime of slavery can then be divided into the two (2) elements remaining: the act and the means. The *act* is the "harboring, transporting, providing, or obtaining," of forced labor, codified as a violation of 18 U.S.C. §1590, while the *means* is labor "obtained or provided by force, fraud or coercion" and is codified as a violation of 18 U.S.C. §1589.

18. Thus, while the complete definition of 'sex trafficking' is found in the TVPRA under 22 U.S.C. § 7102, and it is specifically prohibited under 18 U.S.C. §1591, it is nevertheless a long-recognized and familiar atrocity

## FACTUAL ALLEGATIONS
### A.  THE HOSPITALITY INDUSTRY'S PARTICIPATION
### IN THE SEX TRAFFICKING INDUSTRY

*"75% of survivors responding to Polaris's survey reported coming into contact with hotels at some point during their exploitation… Unfortunately, 94% also disclosed that they never received any assistance, concern, or identification from hotel staff."*

*-The Polaris Project*[7]

19. Human trafficking is the world's fastest growing crime.[8] While the term 'human trafficking' incorporates all forced labor, the sex trafficking industry alone pulls in an estimated $99 billion each year making it the second largest illicit crime industry behind only the sale of ***all*** illegal drugs.[9]

20. Sex traffickers, or 'pimps', use threats, violence, manipulation, lies, debt bondage, and other forms of coercion to compel adults and children to engage in commercial sex acts against their will.

21. The hospitality industry plays a crucial role in the sex trade.[10] The trope of the "no-tell motel" is certainly not a new one. Hotels have long profited from their reputations as havens of

---

[7] *Recommendations for Hotels and Motels*, THE POLARIS PROJECT, https://polarisproject.org/hotels-motels-recommendations (last visited June 19, 2019).
[8] *Human Trafficking is the World's Fastest Growing Crime*, THE ADVISORY BOARD (May 22, 2017, 9:30 AM), https://www.advisory.com/daily-briefing/2017/05/22/human-trafficking.
[9] *Profits and Poverty: The Economics of Forced Labor*, INTERNATIONAL LABOR ORGANIZATION (May 24, 2014), http://www.ilo.org/global/publications/ilo-bookstore/order-online/books/WCMS_243391/lang--en/index.htm.
[10] Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

privacy and discretion for the offending. Hotels offer anonymity and non-traceability, making them ideal venues for crime and sex trafficking in particular.

22.   According to National Human Trafficking Hotline statistics, hotels are the top-reported venue, even over commercial front brothels, where sex trafficking acts occur.[11] Traffickers and buyers alike frequently use hotel rooms to exploit victims.

23.   Traffickers use hotels as the hub of their operations. Inside, the victims are harbored, raped, assaulted, and forced to service buyers who come to the hotel solely to purchase sex.   This is referred to as an 'in call'.

24.   Hotels are also the venue of choice for buyers seeking an 'out call,' wherein the buyer rents a hotel room and the trafficker delivers the victim to the buyer's room to complete the sordid transaction. Unsurprisingly, those on the demand side of this transaction (i.e. those purchasing sex) typically choose to engage in trafficking away from their home, naturally leading to the increased involvement of hotels. In New York City alone, 45% of all reported sexual exploitation took place in hotels, including the Ritz Carlton and the Plaza.[12]

25.   The problem is industry wide. In the United States, as much as 63% of all trafficking incidents happen in hotels ranging from luxury to economy.[13]

26.   Due to the overall complacency of the hospitality industry on addressing the issue, hotels are *the* venue of choice for sex trafficking.[14] Traffickers and buyers capitalize on the hotel industry's general refusal to adopt and enforce company-wide anti-trafficking policies from the corporate to the property level, train staff on what to look for and how to respond, and/or establish safe and secure reporting mechanisms for those at the point of sale.

27.   Every day, thousands of hotel employees witness manifestations of sex trafficking and commercial exploitation. Thus, the hospitality industry has the greatest reach to prevent, identify

---

[11] *National Human Trafficking Hotline Statistics*, THE POLARIS PROJECT (2016), https://polarisproject.org/resources/2016-hotline statistics.
[12] Giovanna L. C. Cavagnaro, *Sex Trafficking: The hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.
[13] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015).
[14] *Hotels Initiative*, THE POLARIS PROJECT, https://polarisproject.org/initiatives/hotels (last visited June 19, 2019).

and thwart sexual exploitation where it is most likely to occur. [15]

28.   But aside from their unique position in this epidemic, hotels and motels have the highest obligation to protect their guests from known dangers, including sex trafficking and sexual exploitation, and should be held accountable when they fail to comply. As aptly stated in a publication by the Cornell University School of Hospitality, "the hospitality industry is undoubtedly involved in the sex trafficking industry…and therefore has an inherent responsibility to deter the crime and can be liable for failing to do so."[16]

29.   Training hotel staff to identify the signs of sex trafficking and sexual exploitation is a critical and obvious legal obligation for the hospitality industry. The presence of sex trafficking and sexual exploitation in a hotel is frequently an obvious occurrence and, although unutilized, underutilized, or ineffectively utilized, numerous well-researched trainings and toolkits have been published to the hotel industry over the last decade to help hotel staff in every position to identify the signs.[17]

30.   From check-in to check-out there are a number of indicators that traffickers and their victims exhibit during their stay at a hotel. With proper training and the implementation of reasonable security measures, hospitality companies could prevent regular sex trafficking under their flag.

31.   Obvious signs of sex trafficking at a hotel may include: an excess of condoms in rooms, individuals carrying or flashing large amounts of cash, excessive amounts of cash stored in the room, renting two (2) rooms next door to each other, declining room service for several consecutive days, significant foot traffic in and out of room(s), men traveling with multiple women who appear unrelated, women known to be staying in rooms without leaving, women displaying physical injuries or signs of fear and anxiety, guests checking in with little or no luggage, hotel guests who prevent another individual from speaking for themselves, or a guest controlling another's

---

[15] *Combating Human Trafficking in the Hotel Industry*, HUFFPOST (Jul. 22, 2015), https://www.huffpost.com/entry/combating-human-trafficking-in-the-hotel-industry_b_7840754 (last visited November 18, 2019).

[16] Giavanna L. C. Cavagnaro, *Sex trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

[17] DEPARTMENT OF HOMELAND SECURITY, *Blue Campaign Toolkit*, attached as "Exhibit A." Available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.

identification documents.[18]

32.   Obviously, hotel staff who have undergone training are more aware of sex trafficking when it happens and are more willing to report it than hotel staff who have not been trained.[19] Thus, hospitality companies are obligated to adopt policies and procedures related to sex trafficking and to enforce these policies and procedures as brand standard through to the property level.

33.   Hospitality companies can and should mandate that *all* staff working at *all* hotel properties across their brand complete sex trafficking training.[20]

34.   The hospitality industry has been cognizant of their role and responsibilities in the sex trafficking industry for years.

35.   At the General Assembly of the United Nations ("UN") convened in New York, New York in November 2000, the Palermo Protocol to prevent, suppress, and punish trafficking in persons was adopted.[21]

36.   In this regard, End Child Prostitution and Trafficking ("ECPAT-USA") launched the Tourism Child-Protection Code of Conduct (the "Code") in the United States in 2004.[22]

37.   The Code identifies the following six (6) steps companies can take to prevent child sex trafficking: (1) establish corporate policy and procedures against sexual exploitation of children; (2) train employees in children's rights, the prevention of sexual exploitation and how to report suspected cases; (3) include a clause in further partner contracts stating a common repudiation and zero tolerance policy of sexual exploitation of children; (4) provide information to travelers on children's rights, the prevention of sexual exploitation of children and how to report suspected

---

[18] *Id*. See also, Shea M. Rhodes, *Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees*, THE INSTITUTE TO ADDRESS CRIMINAL SEXUAL EXPLOITATION, Villanova University School of Law (2015), https://cseinstitute.org/wp-content/uploads/2015/06/Hotel_Policy_Paper-1.pdf.
[19] Giavanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.
[20] Shea M. Rhodes, *Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees*, The Institute to Address Criminal Sexual Exploitation, Villanova University School of Law (2015), https://cseinstitute.org/wp-content/uploads/2015/06/Hotel_Policy_Paper-1.pdf.
[21] Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children, supplementing the United Nations Convention against Transnational Organized Crime, *adopted* Nov. 15, 2000, 2237 U.N.T.S. 319.
[22] ECPAT-USA, *No Vacancy For Child Sex Traffickers Impact Report* (2017), *available at*: https://static1.squarespace.com/static/594970e91b631b3571be12e2/t/59c9b6bfb07869cc5d792b8c/1506391761747/NoVacany_Report.pdf.

cases; (5) support, collaborate and engage stakeholders in the prevention of sexual exploitation of children; and (6) report annually on the company's implementation of Code-related activities.

38.   In 2010, the United States government released its Trafficking in Persons Report, which included an assessment of trafficking in the United States. The Trafficking in Persons Report 2010 stated that approximately 12.3 million adults and children were in forced labor, bonded labor, and force prostitution around the world, but that only 4,166 trafficking prosecutions were successful in 2009.[23]

39.   During a speech in New York City in September 2012, President Obama stated that human trafficking "ought to concern every person, because it is a debasement of our common humanity. It ought to concern every community, because it tears at our social fabric. It ought to concern every business, because it distorts markets. It ought to concern every nation, because it endangers public health and fuels violence and organized crime."[24]

40.   Statistics released in 2014 by the International Labor Organization ("ILO") showed that approximately 4.5 million people were victims of forced sexual exploitation globally and that the violation of their human rights yielded an estimated annual profit of $99 billion dollars for sex traffickers worldwide.[25] Put another way, the numbers showed that a sex trafficker's annual profit per victim was approximately $22,000.00.[26]

41.   A scholarly article published in 2015 estimated that pimps could earn $25,000.00 to $33,000.00 per week selling in the Atlanta, Georgia area.[27] This volume of and profit from sex trafficking also aligned with internet advertising for the sex trafficking industry occurring in roughly the same time period. For example, in 2015, one advertisement in the Atlanta section of the www.backpage.com website triggered 181 clients, and calls or texts from twenty-seven (27) men expressing interest – in a span of just ninety (90) minutes.[28]

---

[23] CNN Wire Staff, *U.S. human trafficking report includes U.S. cases for first time*, CNN.com (Jun. 14, 2010), available at https://www.cnn.com/2010/US/06/14/human.trafficking/index.html#.
[24] President Barack Obama, Remarks to the Clinton Global Initiative (Sept. 25, 2012), *available at* https://obamawhitehouse.archives.gov/the-press-office/2012/09/25/remarks-president-clinton-global-initiative.
[25] International Labour Office, *Profits and Poverty: The Economics of Forced Labour* (2014), at 13, *available at* https://www.ilo.org/wcmsp5/groups/public/---ed_norm/---declaration/documents/publication/wcms_243391.pdf.
[26] *Id.* at 15.
[27] Sarkisian, supra n.13, at 4.
[28] *Id.* at 5.

42.   In December 2015, President Obama appointed eleven (11) survivors of human trafficking to the inaugural United States Advisory Council on Human Trafficking to advise and make recommendations on federal anti-trafficking policies to the President's Interagency Task Force to Monitor and Combat Trafficking in Persons.[29]

43.   The United States Department of Justice ("DOJ") brought 248 sex trafficking prosecutions in Fiscal Year 2015 and secured convictions against 291 sex traffickers.[30] In the previous year, DOJ convicted a total of 184 human traffickers (inclusive of labor trafficking) and in the subsequent year, DOJ convicted a total of 439 human traffickers (inclusive of labor trafficking).[31]

44.   Despite these efforts of governmental and non-governmental organizations to combat human trafficking, the hospitality industry as a whole, continued to lag behind in its efforts to prevent human trafficking. A 2015 study showed that forty-five percent (45%) of children who suffered sexual exploitation report that the sexual exploitation took place in a hotel.[32]

45.   Even estimates by attorneys *for the* hospitality industry indicate that eight (8) out of ten (10) arrests for human trafficking occur in or around hotels.[33] The 2016 Trafficking in Persons Report issued by the United States Department of State also confirmed that human trafficking occurs in the hospitality industry in the United States.[34]

46.   Between 2007 and March 2015, more than 1,400 human trafficking cases have been reported to the National Trafficking Resource Center.[35]

47.   The complicity of the hospitality industry is essential to the perpetuation of human trafficking, allowing traffickers to remain transient, collect profits, and evade detection. Sex trafficking ventures move from place to place so that they are less visible to law enforcement. Similarly, sex traffickers

---

[29] U.S. Dep't of State, *2016 Trafficking in Persons Report* (2016), at 41, *available at* https://www.state.gov/documents/organization/258876.pdf.
[30] *Id*. at 389.
[31] Human Rights First, *Fact Sheet 2017* (2017), *available at* http://www.humanrightsfirst.org/sites/default/files/TraffickingbytheNumbers.pdf.
[32] Sarkisian, *supra* n.13.
[33] Rich Keating, *Human Trafficking: What It Is And How It Impacts The Hospitality Industry*, Presentation. Delivered At AHIA Sprint Conference 2013, Washington, D.C., *available at* http://www.ahiattorneys.org/aws/AHIA/asset_manager/get_file/92983 (last visited Mar. 1, 2019).
[34] U.S. Dep't of State, *supra* n.29, at 387.
[35] Polaris, *Human Trafficking and the Hotel Industry* (2015), *available at* https://polarisproject.org/resources/human-trafficking-and-hotel-industry.

also want to keep their victims moving from place to place to isolate them from any possible means of escape or rescue. Traffickers are well aware of the seclusion and anonymity attendant with booking rooms with hotel chains – they know it is unlikely that they will be disturbed.

48. Due to the hospitality industry's failure to embrace anti-trafficking policies and practices, children and other vulnerable persons are trafficked for sex in hotels throughout the United States.

49. In 2011, Wyndham Hotels trained only some of its employees to look for signs of trafficking.[36]

50. In 2012, an anti-trafficking coalition alerted Defendants Choice Hotels of the likelihood of sex trafficking during the London Olympics, and inquired about the companies anti-trafficking policies, while urging immediate action regarding trafficking.

51. Choice Hotels claims it has supported the anti-trafficking group Polaris since 2010 and in a partnership with ECPAT (End Child Prostitution, Pornography and Trafficking of Children for Sexual Purposes) developed a training module in 2010 for hotel management and staff.

52. Further, campaigns recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue, and took initiatives as early as 1997 with the United Nations Blue Heart Campaign and domestically in 2010 with the Department of Homeland Security's Blue Campaign.[37] These efforts sought to educate both the public and private sectors on identifying and combatting human trafficking, including the hospitality industry and both campaigns released online resources and toolkits publicly accessible to any entity concerned with human trafficking.[38]

53. Hospitality companies have both the power and responsibility to make sex trafficking difficult for the offenders. Yet, they either repeatedly fail to heed the call or repeatedly failed to execute their own policies. Instead, each continues to facilitate these crimes at their hotels, content to direct their efforts solely towards profit and the bottom line.

---

[36] Katie Lobosco, *Super 8 workers trained to spot sex trafficking*, CNN BUSINESS (Nov. 18, 2014), https://money.cnn.com/2014/11/18/news/companies/days-inn-sex-trafficking/.
[37] *DHS Blue Campaign Five Year Milestone*, DEPARTMENT OF HOMELAND SECURITY (Jul. 22, 2015), https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.
[38] *Human Trafficking and the Hospitality Industry*, DEPARTMENT OF HOMELAND SECURITY, https://www.dhs.gov/blue-campaign/hospitalityindustry (last visited June 19, 2019).

### A.   THE DEFENDANTS CONTROL THE HOSPITALITY INDUSTRY

54.   Hotel brands or flags lend their name and likeness to third party owners, while the building and operations are run by a franchisee or a third party management company under the brands' control. In return, the parent brand exchanges the high risk that is inherent in owning an asset like a hotel for the low risk associated with owning a franchise contract and still profits from putting heads in beds.

55.   The average consumer does not see this relationship. The parent brand gives the franchisee property its identity. It provides signage on and in front of the building that assures customers that if they check into that hotel they can expect the standards consistent with the parent hotel brand. The same brand emblazoned on everything in the hotel from the pens in the bedside tables to the staff uniforms at the front desk.

56.   In addition to brand recognition, a marketing organization, hotel listings in the Global Distribution System (GDS) and other online travel agency databases, the brand provides the franchise hotel with access to its brand wide central reservation system, 800 number, revenue management tools, world-class loyalty programs and a website.   Thus, booking and room reservations are controlled by the corporate parent brand.[39]

57.   The franchise hotel typically pays around 10% of their total revenue back to the parent hotel brand and is required to develop and maintain the property in accordance with the parent brand's standards as they are laid out in the franchise agreement.

58.   Per the franchise agreement, the parent brand may enforce these standards through periodic inspections and even termination of the franchise agreement if the franchise hotel is found to be inadequate. The right of the parent hotel brand to enforce their brand standards is also their responsibility.

59.   At the time of the incidents alleged herein:

     a.   Defendant Wyndham owned and controlled the Super 8® and Days Inn® brands.

     b.   Defendant Choice owned and controlled the Clarion Inn® brand.

---

[39] Ellen Meyer, *The Origins and Growth of Franchising in the Hotel Industry*, LODGING MAGAZINE (April 10, 2018) https://lodgingmagazine.com/the-origins-and-growth-of-franchising-in-the-hotel-industry/.

60.    Parent hotel brands may kick delinquent hotels out of their system but it is at the expense of terminating their royalty payments.

## B.  THE DEFENDANTS' ACTUAL AND/OR CONSTRUCTIVE KNOWLEDGE OF SEX TRAFFICKING AT THEIR HOTELS

61.    Defendants Wyndham and Choice ("Defendant Hotels") have been on notice of repeated incidences of sex trafficking occurring at their Super 8, Days Inn, and Clarion Inn brand hotels, yet these brand managers failed to take the necessary action to prevent sex trafficking and still persist in failing to take the necessary action to prevent sex trafficking at their hotels.

62.    Several courts have found failure to implement policies sufficient to combat a known problem in one's operations can rise to the level of willful blindness or negligence.[40]

63.    WYNDHAM HOTELS AND RESORTS, INC. ("WYNDHAM"):

a.    For years Defendant Wyndham has been on notice of repeated incidences of sex trafficking occurring on its Super 8® and Days Inn® branded properties, yet Defendant Wyndham has failed to take action to prevent sex trafficking at Super 8® and Days Inn® brand properties and still persists in failing to take necessary action to prevent sex trafficking on its properties. Defendant Wyndham's inattention in this regard enabled and contributed to the sex trafficking the Plaintiff suffered at the Super 8® and Days Inn® hotels.

b.    There are numerous examples across place and time of Defendant Wyndham's knowledge of sex trafficking on its branded properties and its continued, total inattention to preventing and remedying the blight of human trafficking on the lives and liberties of its victims.

c.    In 2011, Defendant Wyndham's predecessor entity Wyndham Worldwide Corporation, signed the Code, but as evidenced by the widespread sex trafficking which continued to occur at Defendant Wyndham's branded properties, Defendant Wyndham did not practice what it preached. Defendant Wyndham's adoption of the Code appears to have

---

[40] *See Brown v. Corr. Corp. of Am.*, 603 F.Supp.2d 73, 81 (D.D.C. Mar. 26, 2009); *Trollinger v. Tyson Foods, Inc.*, 2007 WL 1574275, at *12 (.E.D. Tenn. May 29, 2007).

been nothing more than a strategic maneuver through which it sought a shield against liability, but not a sword against human trafficking.

d.  Despite Defendant Wyndham's anti-trafficking stance, Defendant Wyndham failed to implement and enforce any of its own policy or policies including with respect to the Super 8® and Days Inn® hotels. Defendant Wyndham knew or should have known that the Super 8® and Days Inn® were located in an area known for sex trafficking activity, and sex trafficking and prostitution continued to regularly occur on and around their branded hotel premises, including when A.T. was trafficked. Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its branded hotels, Defendant Wyndham failed to take adequate measures to prevent the misconduct.

e.  Defendant Wyndham owns, supervises, or operates the Super 8® and Days Inn® hotels. Wyndham failed to implement and enforce any of its own policy or policies and protect Plaintiff A.T. from being sex trafficked.

f.  Defendant Wyndham had actual knowledge of sex trafficking occurring on its branded hotel properties because Wyndham, Super 8®, and Days Inn® knew that sex trafficking and prostitution are associated with a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp-sex trafficking victim/prostitute relationship involves the use of force, fraud, and coercion. Wyndham, Super 8®, and Days Inn® allowed, authorized, permitted, induced, or encouraged the trafficking of individuals for sex at the Super 8® and Days Inn®. Wyndham, Super 8®, and Days Inn® facilitated the trafficking through its practices, policies, and procedures. Wyndham and Super 8® failed to take appropriate action to prevent the trafficking of individuals for sex so that Wyndham, Super 8®, and Days Inn® could continue to profit from the business that trafficking brings, including business from out-of-state.

g.  Defendant Wyndham had constructive knowledge of sex trafficking occurring on its branded hotel properties because Wyndham, Super 8®, and Days Inn® knew that sex

trafficking and prostitution are associated with a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp-sex trafficking victim/prostitute relationship involves the use of force, fraud, and coercion. Wyndham, Super 8®, and Days Inn® allowed, authorized, permitted, induced, or encouraged the trafficking of individuals for sex at the Super 8® and Days Inn®. Wyndham and Super 8® facilitated the trafficking through its practices, policies, and procedures. Wyndham, Super 8®, and Days Inn® failed to take appropriate action to prevent the trafficking of individuals for sex so that Wyndham, Super 8®, and Days Inn® could continue to profit from the business that trafficking brings, including business from out-of-state.

h. Wyndham knew or should have known that the Super 8® and Days Inn® hotels where Plaintiff A.T. was trafficked was located in an area known for criminal conduct and prone to sex trafficking activity on and around the hotel premises, including when Plaintiff A.T. was trafficked.

i. Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, Defendant Wyndham has repeatedly failed to stop these actions.

j. Defendant Wyndham exercised control over Super 8® and Days Inn® hotels by:

   i. distributing information to assist employees in identifying human trafficking;

   ii. providing a process for escalating human trafficking concerns within the organization;

   iii. requiring employees to attend training related to human trafficking;

   iv. providing new hire orientation on human rights and corporate responsibility;

   v. providing training and education to Super 8® and Days Inn® branded hotels through webinars, seminars, conferences, and online portals;

   vi. developing and holding ongoing training sessions on human trafficking; or

   vii. providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention.

k.  Wyndham was in an agency relationship with Super 8® and Days Inn® branded hotels offering public lodging services in the hotel. This agency relationship was created through Defendant Wyndham's exercise of an ongoing and systemic right of control over Super 8® and Days Inn® hotels by Defendant Wyndham's operations, including the means and methods of how Super 8® and Days Inn® branded hotels conducted daily business through one or more of the following actions:

    i.  hosting online bookings on Defendant Wyndham's domain;

    ii.  requiring Super 8® and Days Inn® branded hotels to use Defendant Wyndham's customer rewards program;

    iii.  setting employee wages;

    iv.  making employment decisions;

    v.  advertising for employment;

    vi.  sharing profits;

    vii.  standardized training methods for employees;

    viii.  building and maintaining the facility in a manner specified by the owner;

    ix.  standardized or strict rules of operation;

    x.  regular inspection of the facility and operation by owner;

    xi.  fixing prices; or

    xii.  other actions that deprive Super 8® and Days Inn® branded hotels of independence in business operations.

l.  An apparent agency also exists between Defendant Wyndham, Super 8®, and Days Inn® hotels. Defendant Wyndham held out Super 8® and Days Inn® branded hotels to the public as possessing authority to act on its behalf.

m.  Given Defendant Wyndham's public statements on behalf of its hotel brands and the control it assumed in educating, implementing, and directing its branded hotels, including Super 8® and Days Inn® branded hotels, Defendant Wyndham breached its duties in the following ways:

    i.  did not adequately distribute information to assist employees in identifying

human trafficking;

    ii.   failed to provide a process for escalating human trafficking concerns within the organization;

    iii.  failed to mandate managers, employees, or owners attend training related to human trafficking;

    iv.  failed to provide new hire orientation on human rights and corporate responsibility;

    v.   failed to provide training and education on human trafficking through webinars, seminars, conferences, and online portals;

    vi.  failed to develop and hold or require ongoing training sessions on human trafficking; or

    vii.  failed to provide checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention.

n.   For years, Defendant Wyndham has demonstrated actual and/or constructive knowledge of the rampant culture of sex trafficking which tragically occurs on its Super 8® and Days Inn® branded properties throughout the country. This same entrenched, pervasive actual and/or constructive knowledge of sex trafficking facilitated the sex trafficking of Plaintiff A.T. at the Super 8® and Days Inn® hotels that forms the basis of this complaint.

    i.   In 2008, a man was spotted outside a Super 8 motel with a minor while a federal vice task force was working a sting. In 2010, the pimp was sentenced to 12.5 years in prison for sex trafficking of a minor.[41]

    ii.  In July 2008, a woman was arrested during a police stakeout at a Days Inn and charged with prostitution for allegedly trading sex for gasoline, while the buyer

---

[41] *'Y2K Pimp' Gets 12 Years for Recruiting Minor on MySpace*, WIRED (Nov. 8, 2010), https://www.wired.com/2010/11/epps/.

was charged with promoting prostitution.[42]

iii. In February 2010, a prostitution sting that started with a Craigslist ad ended with three metro Atlanta women and a 15-year-old Atlanta girl being arrested at a Days Inn hotel.[43]

iv. In February 2010, an undercover sting resulted in three (3) arrests at the Super 8 Motel where males were hiring females for sex off of backpage.com.

v. In August 2016, three people were arrested at the Super 8 Jackson Hole as a result of an undercover sting.[44]

vi. Additionally, Defendant Wyndham has been aware of sex trafficking on Super 8® and Days Inn® brand properties through publicly available websites such as www.tripadvisor.com. Online reviews show the pervasiveness of customer reported sex trafficking on Super 8® and Days Inn® brand properties and Defendant Wyndham's inattentiveness, for example:

- In September of 2007, a reviewer described a Days Inn in Spartanburg, South Carolina as follows: "When leaving the room, two prostitutes informed us that, 'We've used most of the rooms here and they were fine.' We left and stayed at the Choice Inn across the road."[45]

- The Super 8 located at 31-62 14th Street Long Island City, New York 11106 received this review in October 2008: "If you are wanting to stay at a motel that promotes prostitution then this is

---

[42] Sex for Gas, THE SMOKING GUN (Jul. 2, 2008), http://www.thesmokinggun.com/documents/crime/sex-gas.
[43] Larry Hartstein, *Craigslist prostitution sting nets 4 arrests*, THE ATLANTA JOURNAL-CONSTITUTION (Feb. 9, 2010), https://www.ajc.com/news/local/craigslist-prostitution-sting-nets-arrests/HvY72Eh4nKE1Ej7jo4WIyH/
[44] *Prostitution bust at Super 8 Motel*, JACKSON HOLE NEWS & GUIDE (Aug. 23, 2016), https://www.jhnewsandguide.com/news/cops_courts/article_2eca6a4a-85e0-5bfb-950f-86adcb5bbb55.html.
[45] Review of Days Inn by Wyndham Spartanburg Waccamaw, Spartanburg, SC (Sept. 29, 2007), *available at* https://www.tripadvisor.com/ShowUserReviews-g54448-d97597-r10019529-Days_Inn_by_Wyndham_Spartanburg_Waccamaw-Spartanburg_South_Carolina.html.

the place for you…"[46]

- The Super 8 located at 1832 ½ W Lucas Street Florence, South Carolina 29501 received this review in April 2010: "…This is truly a prostitution ring. Not worth bringing your children to. You could hear women in high heels walking up and down the stairs, vehicles pulling in and out, knocking on hotel rooms upstairs and downstairs. So much activity, it's literally dangerous…"[47]

- In September 2012, a reviewer described the Super 8 in Manassas, Virginia as follows: "This place is a dump! I left 1 day early because of bug bites. Saw people hanging out on the balcony at night. Also saw a man leave from a 1st floor room with a prostitute. So much for being family friendly."[48]

- In October of 2012, a reviewer described a Days Inn in Fort Myers, Florida as follows: "thought I was staying in a crackhead/prostitute hotel. [Y]our corporate office [should] really look at this place. [T]here were hookers conducting business right outside my front door and [I] had my children with me!"[49]

- In July of 2015, a reviewer described the Days Inn in Baltimore, Maryland as follows: "This property is nothing full of Human trafficking rings… When we first came in that room we were harassed by what is pimps. Young girls walking around talking

[46] Review of Super 8 by Wyndham Long Island City (Oct. 4, 2008), *available at* https://www.tripadvisor.com/ShowUserReviews-g48080-d248683-r20611520-Super_8_by_Wyndham_Long_Island_City_LGA_Hotel-Long_Island_City_Queens_New_York.html.

[47] Review of Super 8 by Wyndham Florence (Apr. 18, 2010), *available at* https://www.tripadvisor.com/ShowUserReviews-g54229-d97167-r61797195-Super_8_by_Wyndham_Florence-Florence_South_Carolina.html.

[48] Review of Super 8 by Wyndham Manassas (Sept. 26, 2012), *available at* https://www.tripadvisor.com/ShowUserReviews-g60895-d110534-r141365522-Super_8_by_Wyndham_Manassas-Manassas_Prince_William_County_Virginia.html.

[49] Review of Days Inn by Wyndham Fort Myers, Fort Myers, FL (Oct. 10, 2012), *available at* https://www.tripadvisor.com/ShowUserReviews-g34230-d84524-r142467996-Days_Inn_by_Wyndham_Fort_Myers-Fort_Myers_Florida.html.

about where is [the] next client."[50]

- In August of 2015, a reviewer described the Days Inn in Fort Myers, Florida as follows: "This motel is filled with drug dealers and prostitutes. The owner/[management] is well aware of this and does nothing about it. While there a woman overdosed and the police were there four times in other drug related issues... "[51]

- The Super 8 located at 340 W Illinois Avenue I-55 Exit 12C Memphis, Tennessee 38106 received this review in August 2018: "Please don't stay here… The people in the next room had men coming in and out all night…"[52]

64.   CHOICE HOTELS INTERNATIONAL, INC. ("CHOICE")

a.   Choice Hotels failed to implement and enforce any of its own policy or policies and protect Plaintiff from being sex trafficked.

b.   Defendant Choice had actual knowledge of sex trafficking occurring on its branded hotel properties because Choice and Clarion Inn knew that sex trafficking and prostitution are associated with a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp-sex trafficking victim/prostitute relationship involves the use of force, fraud, and coercion. Choice and Clarion Inn allowed, authorized, permitted, induced, or encouraged the trafficking of individuals for sex at the Clarion Inn. Choice and Clarion Inn facilitated the trafficking through its practices, policies, and procedures. Choice and Clarion Inn failed to take appropriate action to prevent the trafficking of individuals for sex so

---

[50] Review of Days Inn by Wyndham Baltimore West Security Blvd (Jul. 2015), *available at* https://www.tripadvisor.com/ShowUserReviews-g4274735-d89325-r291242826-Days_Inn_by_Wyndham_Baltimore_West_Security_Blvd-Milford_Mill_Maryland.html.
[51] Review of Days Inn by Wyndham Fort Myers, Fort Myers, FL (Aug. 1, 2015), *available at* https://www.tripadvisor.com/ShowUserReviews-g34230-d84524-r294688173-Days_Inn_by_Wyndham_Fort_Myers-Fort_Myers_Florida.html.
[52] Review of Super 8 by Wyndham Memphis/Dwtn/Graceland Area (Aug. 31, 2018), *available at* https://www.tripadvisor.com/ShowUserReviews-g55197-d105222-r612562242-Super_8_by_Wyndham_Memphis_Dwtn_Graceland_Area-Memphis_Tennessee.html.

that Choice and Clarion Inn could continue to profit from the business that trafficking brings, including business from out-of-state.

c.  Defendant Choice had constructive knowledge of sex trafficking occurring on its branded hotel properties because Choice and Clarion Inn knew that sex trafficking and prostitution are associated with a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp-sex trafficking victim/prostitute relationship involves the use of force, fraud, and coercion. Choice and Clarion Inn allowed, authorized, permitted, induced, or encouraged the trafficking of individuals for sex at the Clarion Inn. Choice and Clarion Inn facilitated the trafficking through its practices, policies, and procedures. Choice and Clarion Inn failed to take appropriate action to prevent the trafficking of individuals for sex so that Choice and Clarion Inn could continue to profit from the business that trafficking brings, including business from out-of-state.

d.  Choice Hotels knew or should have known that Clarion Inn® hotels where Plaintiff was trafficked were in areas known for high incidences of crime and prone to sex trafficking activity on and around the hotel premises, including when Plaintiff was trafficked.[53]

e.  Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, Defendant Choice Hotels has repeatedly failed to stop these actions.

f.  Defendant Choice Hotels exercised control over Clarion Inn® hotels by:

    i.   distributing information to assist employees in identifying human trafficking;

    ii.  providing a process for escalating human trafficking concerns within the organization;

    iii. requiring employees to attend training related to human trafficking;

---

[53] *See e.g.*, Andrew Michaels, *Howard police arrest Baltimore man at Laurel motel in latest human trafficking case*, THE BALTIMORE SUN (Aug. 2, 2017), https://www.baltimoresun.com/maryland/laurel/ph-ho-cf-dorchy-human-trafficking-0810-20170802-story.html.

    iv.  providing new hire orientation on human rights and corporate responsibility;

    v.  providing training and education to Clarion Inn® branded hotels through webinars, seminars, conferences, and online portals;

    vi.  developing and holding ongoing training sessions on human trafficking; or;

    vii.  providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention

g.  Choice Hotels was in an agency relationship with Clarion Inn® branded hotels offering public lodging services in the hotel. This agency relationship was created through Defendant Choice's exercise of an ongoing and systemic right of control over Clarion Inn® hotels by Defendant Choice's operations, including the means and methods of how Clarion Inn® branded hotels conducted daily business through one or more of the following actions:

    i.  hosting online bookings on Defendant Choice Hotels' domain;

    ii.  requiring Clarion Inn® branded hotels to use Defendant Choice Hotels' customer rewards program;

    iii.  setting employee wages;

    iv.  making employment decisions;

    v.  advertising for employment;

    vi.  sharing profits;

    vii.  standardized training methods for employees;

    viii.  building and maintaining the facility in a manner specified by the owner;

    ix.  standardized or strict rules of operation;

    x.  regular inspection of the facility and operation by owner;

    xi.  fixing prices; or other actions that deprive Clarion Inn® branded hotels of independence in business operations.

h.  An apparent agency also exists between Defendant Choice Hotels and Clarion Inn® hotels. Defendant Choice Hotels held out Clarion Inn® branded hotels to the public as

possessing authority to act on its behalf.

i. Given Defendant Choice Hotels' public statements on behalf of its hotel brands and the control it assumed in educating, implementing, and directing its branded hotels, including Clarion Inn® branded hotels, Defendant Choice Hotels breached its duties in the following ways:

   i. did not adequately distribute information to assist employees in identifying human trafficking;

   ii. failed to provide a process for escalating human trafficking concerns within the organization;

   iii. failed to mandate managers, employees, or owners attend training related to human trafficking;

   iv. failed to provide new hire orientation on human rights and corporate responsibility;

   v. failed to provide training and education on human trafficking through webinars, seminars, conferences, and online portals;

   vi. failed to develop and hold or require ongoing training sessions on human trafficking; or

   vii. failed to provide checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention.

j. For years, Defendant Choice Hotels has demonstrated actual and/or constructive knowledge of the rampant culture of sex trafficking which tragically occurs on its Clarion Inn® branded properties throughout the country. This same entrenched, pervasive actual and/or constructive knowledge of sex trafficking facilitated the sex trafficking of Plaintiff at Clarion Inn® hotels that forms the basis of this complaint.

   i. In May 2014, the City of Sacramento closed a Clarion Inn in order to remove a threat to public safety, which included criminal activity such as human

trafficking.[54]

ii.   In October 2014, a human trafficking case made its way through the Knox County judicial system after undercover detectives to a backpage ad and made arrangements to meet a prostitute at the Clarion Inn.[55]

iii.   In June 2015, two men were charged with sex trafficking after allegedly forcing a teenage girl into prostitution after responding to an advertisement and meeting the young girl at the Clarion hotel in Queens, New York.[56]

iv.   Additionally, Defendant Choice has been aware of sex trafficking on Clarion Inn brand properties through publicly available websites such as www.facebook.com. Online reviews show the pervasiveness of customer reported sex trafficking on Clarion Inn brand properties and Defendant Choice's inattentiveness, for example:

- In August of 2017, a reviewer on Facebook.com described a stay at the Clarion Inn in San Jose, California as follows: "The surrounding area has constant traffic from prostitutes and druggies."[57]

### C.   THE SEX TRAFFICKING OF A.T.

65.   In 2012, Plaintiff A.T. was first subjugated to sex trafficking at Defendants' hotels when she was 15 years old.

66.   During this time, Plaintiff A.T. was forced to perform commercial sex acts on up to 20 men a day. Over the multiple months Plaintiff A.T. was trafficked, she was raped hundreds, perhaps even thousands, of times for the profit of her pimp and to the benefit of Defendants Wyndham and Choice.

67.   Day after day, a procession of adult men would enter minor Plaintiff A.T.'s room, stay for 15 minutes to an hour on average, and then leave.

---

[54] Bill Lindelof, *Sacramento hotel closed after complaints of drugs, prostitution, robbery*, THE SACRAMENTO BEE (May 2015), https://www.sacbee.com/news/business/article20180466.html.

[55] Jamie Satterfield, *Sex trafficking case sent to Knox County grand jury*, KNOXVILLE NEWS SENTINEL (Oct. 2014), http://archive.knoxnews.com/news/crime-courts/sex-trafficking-case-sent-to-knox-county-grand-jury-ep-701240457-354070691.html/.

[56] Jackie Strawbridge, *Cuffed Brooklyn Men Allegedly Pimped at LIC Hotel*, LICpost.com (Jun. 2015), https://licpost.com/cuffed-brooklyn-men-allegedly-pimped-at-lic-hotel.

[57] Review of Clarion Inn Silicon Valley (August 1, 2017), *available at* https://www.facebook.com/pg/Clarion-Inn-Silicon-Valley-635660233171453/reviews/?referrer=page_recommendations_see_all&ref=page_internal.

68.     The adult men arriving at the Plaintiff's room were typically middle-aged men of a variety of races – none of whom appeared to be age-appropriate contemporaries of the minor Plaintiff. None of these visitors acted in any manner as though they were a guardian or relative of the minor Plaintiff.

69.     Plaintiff's traffickers had a personal relationship with the front desk employee at the Super 8. Through this relationship, Plaintiff's trafficker was able to continuously secure the same room on the third floor next to the staircase.

70.     Through hotel staff and employees, Defendants knew or should have known that Plaintiff A.T. was being trafficked for sex due to, but not limited to:

       a.   large amounts of used condoms, empty lube bottles, and other sex-related items in the hotel room;

       b.   payments for the rooms in cash;

       c.   Plaintiff's physical appearance (malnourished, bruised, beaten)

       d.   a continuous procession of older men entering and leaving minor Plaintiff A.T.'s room;

       e.   excessive requests for sheets, cleaning supplies, room service

       f.   the personal relationship between the front desk employees and Plaintiff's trafficker

71.     After a particularly violent rape of Plaintiff A.T. at the Super 8, the sheets were left bloodied. Cleaning staff came in to clean the room and saw the sheets covered in blood.

72.     One time, an intoxicated "client" became hostile when Plaintiff A.T. told him to leave. His hostility continued outside of Plaintiff A.T.'s room where he yelled and screamed profanities towards Plaintiff A.T. Eventually, he went to his car and left. Shortly afterwards, the manager of the Super 8 Kennewick approached Plaintiff A.T., told Plaintiff she knew Plaintiff was being trafficked, and threatened to kick Plaintiff out if she did not stop. Despite this confrontation, Plaintiff A.T. continued to be raped hundreds of times for the next four weeks at the Super 8 Kennewick.

73.     After being trafficked at the Days Inn Kennewick, Plaintiff's pimp forced her to abruptly vacate the hotel room, causing her to leave behind her belongings and items used during her sex trafficking. A few days later, Plaintiff A.T. returned to the hotel and the front desk returned Plaintiff's belongings to her in a duffel bag. These items included adult lingerie and copious amounts of condoms

and lube.

### D.  THE DEFENDANTS FACILITATED THE TRAFFICKING OF A.T.

74.    Wyndham and Choice ("Defendant Hotels") profited from the sex trafficking of A.T. and knowingly or negligently aided and engaged with her trafficker in his sex trafficking venture. The Defendants leased rooms to A.T.'s traffickers when they knew, or should have known, that her trafficker was using their room to subject A.T. to repeated exploitation as he forced her into sexual servitude.

75.    Defendant Hotels knew, or should have known, that A.T. was being trafficked and that the Defendants were knowingly benefiting financially from said exploitation, because A.T.'s trafficker frequented the Defendants' hotels.

76.    Defendant Hotels knew, or should have known, that A.T. was being trafficked because A.T. constantly entertained traffic to appease her traffickers' daily quotas and their behavior indicated they were using the Defendants' hotels for his illegal sex trafficking venture.

77.    Defendant Hotels actively participated in this illegal endeavor by knowingly or negligently providing lodging in which to harbor A.T. while he was trafficking her.

78.    Defendant Hotels profited from the sex trafficking of A.T. and knowingly or negligently aided and participated with A.T.'s trafficker in his criminal venture. The Defendants took no action as A.T. repeatedly visited the hotel, often with different guests, avoiding all eye contact, and exhibiting signs of malnourishment.

79.    The Defendant Hotels all had the opportunity to stop A.T.'s trafficker and offenders like him from victimizing A.T. and others like her. Instead, every Defendant failed to take reasonable measures to stop sex trafficking from occurring in their hotels.

80.    The Defendant Hotels all financially benefited from the sex trafficking of A.T., and other victims like her, and developed and maintained business models that attract and foster the commercial sex market for traffickers and buyers alike.

81.    Defendant Hotels enjoy the steady stream of income that sex traffickers bring to their hotel brands, such as the Super 8, Days Inn, and Clarion Inn.

82.    Defendant Hotels financially benefit from their ongoing reputation for privacy, discretion,

and the facilitation of commercial sex.

83.   Defendant Hotels failed to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to improve awareness of sex trafficking and/or prevent sexual exploitation on their properties.

84.   Defendant Hotels maintained their deficiencies to maximize profits by:

       a.   Reducing the cost of training employees and managers on how to spot the signs of human trafficking and sexual exploitation and what steps to take;

       b.   Not refusing room rentals, or reporting guests to law enforcement, in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex traffickers or buyers;

       c.   Lowering security costs by not having proper security measures, including, but not limited to, employing qualified security officers to actively combat human trafficking and sexual exploitation.

85.   As a direct and proximate result of these egregious practices on the part of the Defendant Hotels, A.T. and victims of sex trafficking and exploitation like her, have been permanently injured and damaged physically, emotionally, psychologically, and financially.

## CAUSES OF ACTION

### A. COUNT ONE – 18 U.S.C §1595 ("TVPRA")

86.   The Plaintiff A.T. incorporates each foregoing allegation.

87.   A.T. is a victim of sex trafficking within the meaning of 18 U.S.C. §1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. §1595.

88.   The Defendants' acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. §1595. Specifically, the Defendants had a statutory obligation not to benefit financially from a venture that they knew, or should have known, to engage in violations of 18 U.S.C. §1591 (a). At all relevant times, the Defendants breached this duty by participating in, and facilitating, the harboring and providing of A.T. for the purposes of commercial sex induced by force, fraud, or coercion, by their acts, omissions, and commissions.

89.    The Defendants have financially benefited as a result of these acts, omissions, and/or commissions by keeping operating costs low, and maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade. Moreover, the Defendants directly benefitted from the trafficking of A.T. on each occasion they received payment for rooms that she was being kept in at the Defendants' hotels. The actions, omissions, and/or commissions alleged in this pleading were the but-for and proximate cause of A.T.'s injuries and damages.

90. A.T. has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at the Defendants' hotels and properties in violation of 18 U.S.C. §1591(a).

## PRAYER FOR RELIEF

WHEREFORE the Plaintiff requests that the jury selected to hear this case render a verdict in her favor on all counts alleged, and against each and every named Defendant, separately and severally, and that it award damages to her in an amount which will adequately compensate her for the injuries and damages she sustained due to the Defendants' conduct outlined as follows:

    a.  All available compensatory damages for the described losses with respect to each cause of action;

    b.  past and future medical expenses, as well as the costs associated with past and future life care;

    c.  past and future lost wages and loss of earning capacity;

    d.  past and future emotional distress;

    e.  consequential and/or special damages;

    f.  all available noneconomic damages, including without limitation pain, suffering, and loss of enjoyment of life;

    g.  disgorgement of profits obtained through unjust enrichment;

    h.  restitution;

    i.  punitive damages with respect to each cause of action;

    j.  reasonable and recoverable attorneys' fees;

    k.  costs of this action; and

l.    pre-judgment and all other interest recoverable.

Also, on the basis of the foregoing, the Plaintiff requests that a jury be selected to hear this case and render a verdict for the Plaintiff, and against the Defendants, and that it award damages to the Plaintiff in an amount which adequately reflects the enormity of the Defendants' wrongs, and which will effectively prevent other similarly caused acts. Further, the Plaintiff requests that the Court enter judgment consistent with the jury's verdict, and prays for any other damages and equitable relief the Court or jury deems appropriate under the circumstances.

**THE PLAINTIFF DEMANDS A TRIAL BY JURY**

Dated:  January 28, 2020                    **RESPECTFULLY SUBMITTED,**

/s/ Erik L. Bauer
Erik L. Bauer (WSBA No. 14937)
THE LAW OFFICE OF ERIK L. BAUER
215 Tacoma Avenue South
Tacoma, Washington 98402
T: 253-383-2000
F: 253-383-0154
E: erik@erikbauerlaw.com

***Trial Attorney for Plaintiff***